THE CHRONICLE PUBLISHING COMPANY AND SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 18740-90.        Filed October 29, 1991.

*Robert C. Livsey,* for the petitioner.
*Ann M. Murphy,* for the respondent.

OPINION

TANNENWALD, *Judge:* Respondent determined deficiencies in petitioner's 1983, 1984, and 1985 Federal income taxes in the following amounts:

| Year | Deficiency |
|---|---|
| 1983 | $691,835 |
| 1984 | 211,121 |
| 1985 | 441,625 |

The sole issue for decision is whether the newspaper clippings library (clippings library) contributed by petitioner to the California Historical Society, a section 170(c)(2)[1] charitable organization, is ordinary income property under section 1221(3) and therefore subject to the limitation of section 170(e)(1)(A). This issue has been severed from other issues in the case and has been submitted to the Court under Rule 122.

---

[1] All statutory references are to the Internal Revenue Code as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

All of the facts have been stipulated, and the stipulation of facts and attached exhibits are incorporated herein by reference.

Petitioner's principal place of business is in San Francisco, California. Included within petitioner's numerous media-related interests is a daily newspaper, the San Francisco Chronicle (Chronicle).

During 1983 and 1984, petitioner contributed its clippings library to the California Historical Society, a qualifying charitable organization under section 170(c)(2).

The clippings library, which contained approximately 7,800,000 clippings, was compiled from all editions of the Chronicle newspaper dating as far back as 1906. Clippings collected prior to 1906 were destroyed in an earthquake. The library also contained materials from other newspapers, magazines, press releases, brochures, and unpublished materials. Non-Chronicle clippings and materials constituted approximately 20 percent of the library's total content.

All clippings and other materials were mounted on a paper backing for protection and cataloged by subject matter in over 200,000 file envelopes which were arranged in alphabetical order.

Most clippings were cataloged in several envelopes. For example, a newspaper story covering an election would be filed under the particular election, the office, and the candidates' names. Access to clippings contained in the library was facilitated by a master-card file which listed all the envelopes alphabetically by subject matter.

The Chronicle clippings library was open to the general public through the late 1960s, at which time physical access to the library was strictly limited to curtail the volume of public traffic and occasional loss of clippings. Physical access to the library continued to be available for persons demonstrating "significant research needs" such as authors, professors, graduate students, and journalists. At all times since the clippings library's inception, the library staff answered requests for information that could be obtained from information contained in the library, both over the phone and through written correspondence. In addition to public use of the library, Chronicle writers and reporters

utilized the clippings library to conduct research and to verify facts for Chronicle newspaper stories.

In addition to the clippings library, petitioner has maintained a complete collection of the final editions of each daily paper published by the Chronicle dating back to 1865. This collection of final editions was at all relevant times located in a separate storage facility from that housing the clippings library and was not included in the contribution to the California Historical Society.

The entire clippings library was reproduced on approximately 80,000 microfiche before the donation was made to the California Historical Society. This microfiche has been retained by the Chronicle.

Petitioner expended in excess of $10 million creating the clippings library. These costs were deducted by petitioner as ordinary and necessary business expenses during the years petitioner operated the library. Petitioner's basis in the clippings library at the time of contribution was zero.

Petitioner claimed a charitable deduction in respect of its contributions of the clippings library for the years 1983, 1984, and 1985 in the amounts $1,503,988, $458,957, and $891,873. Respondent, in a notice of deficiency dated May 31, 1990, disallowed the claimed deductions in their entirety.

Section 170(a) allows a deduction for charitable contributions to organizations described in section 170(c)(2). Where the charitable contribution consists of property other than money, the amount of the gift is governed by section 170(e)(1)(A), which provides as follows:

SEC. 170(e). CERTAIN CONTRIBUTIONS OF ORDINARY INCOME AND CAPITAL GAIN PROPERTY.—

(1) GENERAL RULE.—The amount of any charitable contribution of property otherwise taken into account under this section shall be reduced by the sum of—

(A) the amount of gain which would not have been long-term capital gain if the property contributed had been sold by the taxpayer at its fair market value (determined at the time of such contribution), * * *

Thus, section 170(e)(1)(A) operates to limit any charitable contribution deduction for property, which if sold would produce ordinary income, to the taxpayer's cost or basis in

the contributed property.[2] Whether such limitation applies herein depends upon whether the clippings library falls within the category of assets encompassed by section 1221(3), which excludes the following properties from the definition of a capital asset:

(3) a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property, held by—

(A) a taxpayer whose personal efforts created such property,

(B) in the case of a letter, memorandum, or similar property, a taxpayer for whom such property was prepared or produced, or

(C) a taxpayer in whose hands the basis of such property is determined, for purposes of determining gain from a sale or exchange, in whole or part by reference to the basis of such property in the hands of a taxpayer described in subparagraph (A) or (B).

Petitioner asserts that: (1) The clippings library is not an asset described in section 1221(3) and (2) even if it is such an asset, section 1221(3) does not apply to a corporate taxpayer. Respondent disputes both assertions. For the reasons hereinafter set forth, we disagree with petitioner and sustain respondent's determination that petitioner is not entitled to any deduction for its contribution of the clippings library to the California Historical Society.

We deal first with the question of the proper characterization of the clippings library. Clearly, it is not, in and of itself, a copyright, literary, musical, or artistic composition, and respondent does not argue that it is. Thus the characterization of the library depends upon whether it falls within the category of a "letter or memorandum, or similar property." The regulations state that the phrase "similar property":

includes, for example, such property as a draft of a speech, a manuscript, a research paper, an oral recording of any type, a transcript of an oral recording, a transcript of an oral interview or of dictation, a personal or business diary, a log or journal, a corporate archive, including a corporate charter, office correspondence, a financial record, a drawing, a photograph, or a dispatch. A letter, memorandum, or property similar to a letter or memorandum, addressed to a taxpayer shall be considered as prepared or produced for him. * * * [Sec. 1.1221-1(c)(2), Income Tax Regs.]

---

[2]The parties agree that if the limitation of sec. 170(e)(1)(A) applies, petitioner is not entitled to the claimed charitable contribution for any of the years at issue in respect of the clippings library.

On two previous occasions, we have considered and sustained the foregoing regulation, albeit in somewhat different factual settings. Thus, in *Glen v. Commissioner*, 79 T.C. 208 (1982), we held that tapes of interviews conducted by the taxpayer constituted "similar property" because they fell within the characterization of "an oral recording" set forth in the regulation. See 79 T.C. at 214. Similarly, in *Morrison v. Commissioner*, 71 T.C. 683 (1979), affd. per curiam 611 F.2d 98 (5th Cir. 1980), we held that letters, copies of letters to or from a taxpayer and third person, and memoranda dealing with problems associated with his service as a Congressman fell within the proscription of section 1221(3) and the foregoing regulation.[3]

The parties have focused their arguments primarily on the categories of "corporate archive," "log or journal," or "office correspondence" embodied in the regulation.[4] Petitioner seeks to confine the meaning of the phrase "corporate archive" to corporate records such as minutes, financial statements, and possibly a chronological file of the newspaper and points to the fact that such a file is separately maintained. "Archive" is defined in Webster's Third New International Dictionary 113 (1981) as follows:

1 * * * a: a place in which public or institutional records (as minutes, correspondence, reports, accounts) are systematically preserved b: a repository for any documents or other materials esp. of historical value (as diaries, photographs, private correspondence) * * * c: any repository or *collection* esp. of information * * * 2: *public or institutional records, historic documents and other materials that have been preserved.* * * * [Emphasis added.]

While the first category of this definition is limited as petitioner suggests, there is no such limitation in the remaining portions of the definition nor is there any indication that the definition is limited to materials presented in chronological sequence or that an institution can have only one form of archive. Clearly, the clippings library is a "collection of information" as well as an "institutional record" that has been preserved. Furthermore, we think it

---

[3]See also *Forrer v. Commissioner*, T.C. Memo. 1981-418.

[4]This focus finds expression in Tech. Adv. Mem. 9037001 (Apr. 30, 1990), in which a newspaper morgue was considered to be "similar property" within the meaning of sec. 1221(3). We note that a Technical Advice Memorandum has no precedential value. Sec. 6110 (j)(3); *Estate of Jalkut v. Commissioner*, 96 T.C. 675, 684 (1991).

significant that "archive" is considered to include "library." See Webster's New Dictionary of Synonyms (1968). Our examination of the legislative history, which we discuss in another context, see *infra* pp. 450-451, reveals nothing which would cause us to conclude that the use of the word "archive" in the regulation constitutes an unwarranted extension of section 1221(3)(B) nor does petitioner advance any such contention. We are satisfied that copies of petitioner's newspaper maintained in topical, as well as chronological, form fall within the scope of the ordinary meaning of "archive." We also note that the phrase "similar property" is not limited in any way by the statute and that the regulations state that the specific categories set forth therein are merely examples of some types of materials which are included within this phrase.[5]

We now turn to petitioner's second argument, namely, that section 1221(3) does not apply to corporations. Petitioner's argument rests almost entirely on the fact that the legislative history of section 1221(3) and its predecessor section 117(a)(1)(C) of the Internal Revenue Code of 1939, added by section 210(a) of the Revenue Act of 1950, ch. 994, tit. II, 64 Stat. 932, speaks of individuals and does not once mention a corporation as falling within the "taxpayer" category.

Concededly, the objective of these statutory provisions was to insure that individuals who disposed of the product of their personal efforts should be treated as having realized ordinary income and not capital gain. This objective is clearly revealed by the legislative history of section 514(a) of the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 643, which amended section 1221(3) to exclude a letter, memorandum, or similar property whether held by the taxpayer whose personal efforts created such property or a taxpayer for whom such property was prepared or produced. The report of the House Ways and Means Committee dealing with this amendment reveals its thrust as well as the thrust of the earlier provision:

*Present law.*—Under present law, copyrights and literary, musical or artistic compositions (or similar property) are not treated as capital

---

[5]Our analysis renders unnecessary any discussion of the possible application of the categories "log or journal" or "office correspondence."

assets if they are held by the person whose personal efforts created the property (or by a person who acquired the property as a gift from the person who created it). Thus, any gain arising from the sale of such a book, artistic work or similar property is treated as ordinary income, rather than as capital gain. Collections of papers and letters prepared and collected by an *individual* (including papers prepared for the *individual*), however, are treated as capital assets. Therefore, a gain from the sale of papers of this nature is treated as a capital gain, rather than as ordinary income.

*General reasons for change.—* * * *

Your committee believes that collections of papers and letters are essentially similar to a literary or artistic composition which is created by the personal effort of the taxpayer, and should be classified for purposes of the tax law in the same manner. In the one case, a person who writes a book and then sells it is treated as receiving ordinary income on the sale of the product of *his* personal efforts (i.e., compensation for personal services rendered). On the other hand, one who sells a paper or memorandum written by or for *him* is treated as receiving capital gain on the sale, even though the product *he* is selling is, in effect, the result of *his* personal efforts.

*Explanation of provision.—*Your committee's bill provides that letters, memorandums, and similar property (or collections thereof) are not to be treated as capital assets, if they are held by a taxpayer whose personal efforts created the property or for whom the property was prepared or produced (or by a person who received the property as a gift from such taxpayer). For this purpose, letters and memorandums addressed to an *individual* are considered as prepared for *him.* Gains from the sale of these letters and memorandums, accordingly, are to be taxed as ordinary income, rather than as capital gains.

[H. Rept. 91-413 (Part I) (1969), 1969-3 C.B. 200, 293; emphasis added.]

The report of the Senate Finance Committee contains almost identical language. S. Rept. 91-552 (1969), 1969-3 C.B. 423, 549. See also Staff of Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1969, at 171 (J. Comm. Print 1970).[6]

We are not disposed to adopt petitioner's position. The structure and language of section 1221(3), see *supra* p. 448, belies any such restrictive interpretation. Thus, subparagraph (A) is clearly limited to a taxpayer "whose personal efforts created such property." However, subparagraph (B) is not so limited and equally clearly covers a taxpayer who did not create the property. Simi-

---

[6]The pertinent legislative history of sec. 210(a) of the Revenue Act of 1950 is set forth in H. Rept. 2319, 81st Cong., 2d Sess. 54, 92-93 (1950); S. Rept. 2375, 81st Cong., 2d Sess. 83-85 (1950); Staff of Joint Comm. on Taxation, Summary of H.R. 8920, The Revenue Act of 1950, at 15 (1950).

larly, subparagraph (C) is also not limited, covering any taxpayer whose basis is determined by reference to the basis of the property in the hands of a taxpayer described in subparagraph (A) or (B). In light of the foregoing and the fact that the word "taxpayer" is broadly defined by section 7701(a)(14) as "any person subject to any internal revenue tax" and "person" is defined by section 7701(a)(1) to include a corporation, we have no hesitancy in concluding that petitioner's corporate status does not preclude it from being covered by section 1221(3).

Petitioner makes no claim that the 20 percent of the materials derived from non-Chronicle sources should be treated differently from the materials prepared for petitioner by its staff. Nor has petitioner sought to avoid the impact of section 1221(3) by arguing that its newspaper and therefore the clippings library represented the product of a business enterprise in its totality because it was derived from personal efforts (for which full value was paid and also from other elements not involving personal efforts—an argument as to which we express no opinion). Cf. Rev. Rul. 55-706, 1955-2 C.B. 300, superseded by Rev. Rul. 62-141, 1962-2 C.B. 182, and the comment thereon in Priv. Ltr. Rul. 8042121 (July 25, 1980). See also *Commissioner v. Ferrer,* 304 F.2d 125, 132 (2d Cir. 1962), revg. in part and remanding on other grounds 35 T.C. 617 (1961).

It may well be that a library of the clippings of a newspaper's articles in the hands of the publisher of the newspaper ought not to be included within the scope of section 1221(3) and ought to be considered a capital asset. But this involves a question of policy and is not for us to decide given the ordinary meaning of the language used in section 1221(3)(B). Cf. *Hanover Bank v. Commissioner,* 369 U.S. 672, 687 (1962); *Kern Co. Electrical Pension Fund v. Commissioner,* 96 T.C. 845, 853 (1991), on appeal (9th Cir., Aug. 16, 1991).

We conclude that, by virtue of section 1221(3)(B) and the regulation thereunder (see *supra* p. 448), the clippings library was not a capital asset and that, consequently, section 170(e) prevents petitioner from obtaining a charita-

ble deduction for its contribution to the California Historical Society.

*An appropriate order will be issued.*