129 T.C. No. 16



UNITED STATES TAX COURT



SHERREL AND LESLIE STEPHEN JONES, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent



Docket No. 20253-04.                    Filed November 1, 2007.



        In 1997, P, an attorney practicing in Oklahoma,
donated to a university library photocopied materials
received from the Government in connection with P's
representation of a criminal defendant.

        <u>Held</u>:  Under Oklahoma law, an attorney does not
own his client's case file, but rather maintains
custodial possession of the file.  Because P did not
possess an ownership interest in the materials and was
thus incapable of effecting a valid gift of the
materials under Oklahoma State law, sec. 170(c),
I.R.C., precludes the charitable contribution
deduction.



<u>Clarke Lewis Randall</u>, for petitioners.

<u>Elizabeth Downs</u>, for respondent.

COHEN, Judge:  Respondent determined deficiencies of $3,675 and $11,109.99 in petitioners' Federal income tax for 2000 and 2001, respectively.  Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue.  The sole issue for decision is whether petitioners are entitled to charitable contribution deduction carryovers for 2000 and 2001 with respect to the 1997 donation of a collection of copies related to one of petitioner's client's case files.

### FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated into our findings by this reference. Petitioners resided in Oklahoma during the years in issue and at the time they filed their petition.

From the date of his appointment by the United States District Court in May 1995 until his withdrawal in August 1997, petitioner Leslie Stephen Jones (petitioner) was lead counsel for the defense of Timothy McVeigh (McVeigh), who was prosecuted for and convicted of the April 19, 1995, bombing of the Alfred P. Murrah Federal Building in Oklahoma City, Oklahoma (the Oklahoma City bombing).  During the course of his representation of McVeigh and for use in the preparation of his legal defense, petitioner was periodically provided with photocopies of documents and copies of certain tangible objects that were

prepared, created, or compiled by agencies of the U.S. Government for the purposes of investigating the Oklahoma City bombing and prosecuting that crime (materials). Petitioner always notified McVeigh of the materials received from the Government and delivered them to McVeigh whenever he requested them and for however long McVeigh desired to keep them.

The materials that petitioner received from the Government in connection with his representation of McVeigh included: Copies of 17,802 Federal Bureau of Investigation (FBI) "320s" (statements of interviews with relevant witnesses); copies of 9,743 FBI "Inserts" (statements of interviews with nonrelevant witnesses); copies of 25,141 pieces of documentary evidence assembled by the FBI; copies of 25,000 pages of FBI notes; copies of 168 files of medical examiner's reports; 100,000 color or black and white photographs taken by Government agencies during the investigation; copies of 1,417 audio and video cassettes made by Government agencies during the investigation; copies of 1,320 computer disks compiled by Government agencies during the investigation; copies of correspondence written by McVeigh to family and friends and acquired by the Government during its investigation (98 letters, 17 postcards, and 11 envelopes); a copy of a text of the Declaration of Independence containing notes made by McVeigh; copies of investigative materials that were compiled by the Government in its prior investigation of

David Koresh (5 boxes of FBI 320s and 5 boxes of transcripts); and copies of Government expert summary reports. None of the materials described above bears an original signature of or original notation by McVeigh or any other person. None of the original items, of which copies are included in the materials described above, were prepared personally by petitioner or for him by anyone under his direction.

Several interested entities, including the U.S. Department of Justice, the U.S. Department of the Treasury, the Oklahoma State Bureau of Investigation, the Oklahoma County District Attorney's Office, and the defense team of Terry Nichols, a convicted conspirator in the Oklahoma City bombing, were provided the same materials or a substantial part of the same materials that petitioner received from the Government in connection with his representation of McVeigh. McVeigh's attorneys on appeal were also provided with copies of the same materials received by petitioner and the other members of McVeigh's defense team during McVeigh's initial trial.

Petitioner contacted the University of Texas at Austin to propose donation of the materials on August 27, 1997, the same day that he was allowed to withdraw from representation of McVeigh. Petitioner required, as a primary condition for making the gift, that the deed of transfer be executed before the end of 1997, without regard to physical delivery of the materials. From

the beginning of formal discussions regarding the potential donation, petitioner placed restrictions on his donation of the materials. Petitioner required that investigative reports given to petitioner by Terry Nichols's attorney remain sealed and that photographs of the deceased victims of the Oklahoma City bombing remain sealed forever. He also required that the University of Texas provide private work space and staff assistance for petitioner or his designated agents to review the materials. Petitioner required that the University of Texas pay both the storage costs with respect to the materials from the date of acknowledgment of the deed of gift in December 1997 until the date of actual delivery of the materials in January 1999 and the shipping costs for delivery of the materials. Petitioner also required that the University of Texas pay for his designated agent to review and organize the materials between the time that the deed of gift was executed and the date of delivery. The review for which the University of Texas paid included determinations by petitioner or his agent about whether certain documents should be removed from the donated materials due to privilege and confidentiality concerns.

On December 24, 1997, petitioner executed a document entitled "Deed of Gift and Agreement", which memorialized the transfer by petitioner to the Center for American History at the University of Texas at Austin (University of Texas), a qualifying

charitable organization under section 170(c), of the above-described materials that petitioner received from the Government during the preparation of McVeigh's legal defense.

On May 1, 1998, John R. Payne (Payne), employed by petitioners to value the materials for the purpose of their claiming a charitable contribution deduction, appraised the materials at $294,877. Payne spent only one day reviewing the materials, which included hundreds of thousands of items contained in 171 boxes. He reviewed only a small percentage of the materials before assessing their value. Although he discounted his preliminary value assessment by 50 percent because none of the materials were originals, Payne did not take into consideration that multiple copies of the materials had been distributed to various attorneys during the course of the underlying trial. Payne's appraisal method in part involved assessing the value of certain documents at the price that a legal research service would charge for access to them. His appraisal method also relied heavily on purchase prices or assessed values of document archives that Payne considered to be comparable collections. All of the collections to which Payne compared the materials possessed by petitioner as part of McVeigh's case file, however, consisted primarily of original documents, handwritten letters, and original signatures of players in other infamous crimes or scandals. None of the

materials in issue are original documents, and none contain an original signature or notation of McVeigh or any other person.

Petitioners claimed a deduction of $294,877 on their joint Federal income tax return for 1997 for the donation of the materials.  The deductions at issue in this case were carried over from petitioners' 1997, 1998, and 1999 Federal income tax returns.

Respondent disallowed the charitable deduction claimed by petitioners for the donation of the materials related to the criminal prosecution of McVeigh for the Oklahoma City bombing because respondent determined that petitioner did not personally own the materials that were provided to him for the purpose of preparing McVeigh's legal defense.

OPINION

In order to be eligible for a charitable contribution deduction under section 170(a), a taxpayer must make a gift of property to a qualifying charitable organization.  Sec. 170(c). The parties agree that the University of Texas is a qualifying charitable organization for purposes of section 170, but they disagree about whether petitioner legally owned the materials and thus whether his donation and transfer of possession of the materials effected a valid gift.  In applying a provision of Federal tax law, State law controls in determining the nature of a taxpayer's legal interest in property.  United States v. Natl.

Bank of Commmerce, 472 U.S. 713, 722 (1985); United States v. Mitchell, 403 U.S. 190, 197 (1971). State law creates legal interests, while Federal law determines when and how those interests shall be taxed. United States v. Mitchell, supra at 197. In order to make a valid gift for Federal tax purposes, a transfer must at least effect a valid gift under the applicable State law. See Woodbury v. Commissioner, 49 T.C. 180, 193-194 (1967).

In the case of a valid gift, the amount of an otherwise allowable deduction for the charitable contribution of property that would produce ordinary income if sold at its fair market value is limited to the donor's cost or basis in the contributed property. Sec. 170(e)(1)(A); Chronicle Publg. Co. v. Commissioner, 97 T.C. 445, 447-448 (1991).

We thus first consider whether petitioner owned the materials donated such that he was capable of making a valid gift under the law of the State of Oklahoma. In determining what the relevant State law is, that State's highest court is the best authority on its own law. Commissioner v. Estate of Bosch, 387 U.S. 456, 465 (1967). Under Oklahoma law, three elements must be present in order to effect a valid inter vivos gift: First, the donor must possess a donative intent; second, actual delivery of the subject matter of the gift must be completed; and, third, the donor must strip himself of all ownership and dominion over the

subject matter of the gift. <u>Frazier v. Okla. Gas & Elec. Co.</u>, 63 P.2d 11, 13 (Okla. 1936). In order to divest himself of ownership and dominion over the subject matter of the gift, petitioner (the donor) must legally own the property in issue. See <u>Pettit v. Commissioner</u>, 61 T.C. 634, 639 (1974) ("A 'gift' has been generally defined as a voluntary transfer of property <u>by</u> <u>the owner</u> to another without consideration therefor." (Emphasis added.)). Beneficial ownership is required. Bare legal title does not control. See <u>Estate of Davenport v. Commissioner</u>, 184 F.3d 1176, 1182-1185 (10th Cir. 1999), affg. T.C. Memo. 1997-390; sec. 25.2511-1(g)(1), Gift Tax Regs.

Respondent contends that petitioner did not own the materials relating to his defense of McVeigh in his trial for the Oklahoma City bombing and thus could not have divested himself of ownership in order to effect a valid inter vivos gift of those materials. Petitioners assert that, under Oklahoma law, petitioner legally owned the materials in issue and that the materials constituted petitioner's personal property.

The parties have not cited, and we have not found, any case in Oklahoma or any other jurisdiction that addresses directly the ownership of materials in the possession of an attorney that are related to the representation of his client. The ownership of client files is apparently an issue of first impression under Oklahoma law. However, Oklahoma State law in related areas

provides us with general guidance, and we are assisted in our analysis by a repository of relevant cases decided by courts in other jurisdictions that have considered the issue of ownership of client files and their specific contents.

Petitioners maintain that, because petitioner at all relevant times exercised possession and control of the materials, petitioner was the legal owner of those materials until he donated them to the University of Texas. Petitioners argue further that, because McVeigh did not typically hold any of the materials in excess of 72 hours, McVeigh did not exhibit control or dominion over the materials and therefore could not be the legal owner of them.

As a general rule under Oklahoma law, possession of personal property is, if unexplained, prima facie evidence of ownership. Ragan v. Citizens' State Bank, 131 P. 1093 (Okla. 1913). Petitioners rely heavily on this general principle of law to support their assertion of petitioner's ownership of the materials. Due to the unique fiduciary relationship between an attorney and his client, however, we are not persuaded that items in an attorney's possession, and especially in a client's case file, generally constitute the attorney's personal property. Ethical rules regarding an attorney's obligation to maintain funds and other property belonging to his client or a third party separate from the attorney's own property, for example, indicate

the attorney's essential role as a fiduciary charged with safekeeping his client's property and interests. See Okla. Stat. Ann., tit. 5, ch. 1, app. 3-A, R. 1.15 (West 2001). Due to the fiduciary nature of an attorney's relationship to his client, we cannot treat petitioner's possession of the materials as prima facie evidence of his ownership. Petitioner's uncontested possession of the materials neither proves ownership nor establishes petitioners' eligibility for a charitable contribution deduction with regard to their donation of the materials.

Respondent argues that general principles of agency law and ethical rules governing the conduct of attorneys establish that petitioner did not own the materials and was not entitled to dispose of them. Respondent contends that petitioner received the materials as an agent of McVeigh during the course of defending McVeigh in his trial for the Oklahoma City bombing and that the materials thus belong to McVeigh, not petitioner. Petitioners maintain that general agency law is inapplicable to this case and that, although his clients may possess a right of access to information in their case files, petitioner, as attorney, is the rightful owner of his clients' case files. Alternatively, petitioners argue that, even if we hold that clients own their case files under Oklahoma law, attorneys are entitled to keep copies of their clients' case files, and,

because the materials contained only copies of documents and other evidence, petitioner rightfully owned them.  We infer that petitioners' argument is essentially that an attorney's right to copy and keep client files for himself is equivalent to traditional rights of ownership, including the right freely to dispose of property.

Central to our analysis of ownership is the principle that the attorney-client relationship is fundamentally one of agency. See Commissioner v. Banks, 543 U.S. 426, 436-437 (2005); State ex rel. Okla. Bar Association v. Taylor, 4 P.3d 1242, 1253 (Okla. 2000); Crisp, Courtemanche, Meador & Associates v. Medler, 663 P.2d 388, 390 (Okla. Civ. App. 1983).  Generally, an agency relationship is one in which the parties agree that one party is to act on behalf of another.  Garrison v. Bechtel Corp., 889 P.2d 273, 283 (Okla. 1995).  Because an attorney is the agent of his client, the delivery of the materials to petitioner occurred within the scope of the agency relationship.  The materials were delivered to petitioner from the Government in the course of his preparation for the defense of McVeigh.  The materials were for McVeigh's benefit and were delivered to allow him and his attorney better to prepare his case for trial.  Indisputably, the materials were delivered to petitioner within the scope of his representation of McVeigh's criminal prosecution for the Oklahoma

City bombing and thus were received by petitioner as the agent of McVeigh.

Petitioners assert that general principles of agency law do not resolve the issue of ownership, and they rely instead on several cases from other jurisdictions that have considered the issue of ownership of client case files.  Those cases generally hold that an attorney or accountant, not his client, has property rights in the portions of his client's case file containing the professional's self-created work product or working papers, generally defined as the attorney's or accountant's notes, drafts, and internal memoranda recording the professional's ideas, opinions, and impressions.  See Corrigan v. Armstrong, Teasdale, Schlafly, Davis & Dicus, 824 S.W.2d 92, 96 (Mo. Ct. App. 1992).  For similar holdings with respect to accountants and their working papers, see also Ipswich Mills v. Dillon, 157 N.E. 604 (Mass. 1927), and Ablah v. Eyman, 365 P.2d 181 (Kan. 1961).  Although petitioners rely heavily on these cases, they represent a small fraction of the jurisdictions that have considered the issue of ownership of an attorney's or an accountant's work product.

The majority of courts that have considered the issue of whether attorneys or clients own case files have held that clients are the legal owners of their entire case files, including the attorney's work product for which the client paid

when he purchased the attorney's services.  See <u>Swift, Currie,</u>
<u>McGhee & Hiers v. Henry</u>, 581 S.E.2d 37, 39 (Ga. 2003) (citing
<u>Resolution Trust Corp. v. H---, P.C.</u>, 128 F.R.D. 647 (N.D. Tex.
1989); <u>In re Kaleidoscope, Inc.</u>, 15 Bankr. 232, 241 (Bankr. N.D.
Ga. 1981), revd. on other grounds 25 Bankr. 729 (N.D. Ga. 1982);
<u>In re Sage Realty Corp. v. Proskauer Rose Goetz & Mendelsohn</u>
<u>L.L.P.</u>, 689 N.E.2d 879, 882-883 (N.Y. App. Div. 1997)); see also
<u>Averill v. Cox</u>, 761 A.2d 1083, 1092 (N.H. 2000); <u>In re X.Y.</u>, 529
N.W.2d 688, 690 (Minn. 1995).  These courts have held that the
creation of the case file is part of the services for which the
client pays his attorney, and they have justified their holdings
that clients have full access to and superior property rights in
their entire case file based primarily on the principle that the
fiduciary relationship between attorney and client necessitates
full disclosure.  See, e.g., <u>Resolution Trust Corp. v. H---,</u>
<u>P.C.</u>, <u>supra</u> at 649-650; see also <u>Swift, Currie, McGhee & Hiers v.</u>
<u>Henry</u>, <u>supra</u> at 40; <u>In re Sage Realty Corp. v. Proskauer Rose</u>
<u>Goetz & Mendelsohn L.L.P.</u>, <u>supra</u> at 882.

However, some courts have held that ownership of a case file
is divided between attorney and client.  These jurisdictions
generally hold that an attorney's work product, including
internal legal memoranda and preliminary drafts of documents,
remains the property of the attorney; however, the client has
superior property rights in the end product of the attorney's

representation, which includes finalized legal documents, pleadings filed, correspondence among parties, and other papers "'exposed to public light by the attorney to further [the] client's interests'". In re Sage Realty Corp. v. Proskauer Rose Goetz & Mendelsohn L.L.P., 689 N.E.2d at 881-882 (quoting Fed. Land Bank v. Fed. Intermediate Credit Bank, 127 F.R.D. 473, 479 (S.D. Miss. 1989), modified 128 F.R.D. 182 (S.D. Miss. 1989)); see also Apa v. Qwest Corp., 402 F. Supp. 2d 1247, 1250 (D. Colo. 2005) (upon termination of representation, attorney must surrender case file to client and the "cost of making a copy of a client file by a withdrawing lawyer belongs to the lawyer, not the client"; however, duplication costs may be charged to the client for copies of the attorney's work product); Loeffler v. Lanser (In re ANR Advance Transp. Co.), 302 Bankr. 607, 614 (E.D. Wis. 2003) (concluding that the difference between the majority and minority rules is primarily who bears the burden of proving need for disclosure or secrecy, respectively, with regard to the attorney's work product); Womack Newspapers, Inc. v. Town of Kitty Hawk, 639 S.E.2d 96, 104 (N.C. Ct. App. 2007) ("anything in a client's file, which is in the hands of the client's attorney, belongs to the client, with the exception only of the attorney's notes or work product"). One State appellate court has held explicitly that, while a client may be entitled to access his attorney's work product in order to understand the services

provided by the attorney, the attorney's fiduciary duties to his client do not necessitate the conclusion that the client has a property right or ownership interest in the attorney's work product. <u>Corrigan v. Armstrong, Teasdale, Schlafly, Davis & Dicus</u>, <u>supra</u> at 98. While the opinions of courts in other jurisdictions are persuasive and helpful in our analysis, we must ultimately determine whether, and to what extent, an attorney or his client owns the client's case file under Oklahoma State law.

The Oklahoma Rules of Professional Conduct generally imply that clients have ownership rights in their case files under Oklahoma law. Rule 1.6 of the Oklahoma Rules of Professional Conduct, which codify general principles regarding an attorney's ethical duties and fiduciary responsibilities to his client, provides:

> (a) A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation * * *

Okla. Stat. Ann. tit. 5, ch. 1, app. 3-A, R. 1.6(a) (West 2001).

Petitioners assert that rule 1.6, Oklahoma Rules of Professional Conduct, is irrelevant because petitioner testified without contradiction that McVeigh waived the attorney-client privilege and the protection of the work product privilege. Petitioner did not testify about any particulars regarding McVeigh's alleged waiver of the attorney-client privilege or

present any evidence to support his claim that his client did waive the attorney-client privilege with regard to the materials. Petitioner's testimony alone, even if uncontradicted, does not establish McVeigh's waiver of the attorney-client privilege. See Boyett v. Commissioner, 204 F.2d 205, 208 (5th Cir. 1953), affg. a Memorandum Opinion of this Court. Confidentiality is a hallmark of the attorney-client relationship, and the attorney's mere conclusion that the client waived that privilege is not sufficient evidence of an explicit waiver. In the absence of evidence establishing that McVeigh consented to disclosure by his attorney of the materials in issue, petitioner is bound by his ethical obligations under the Oklahoma Rules of Professional Conduct to refrain from disclosing and capitalizing on information related to his representation of McVeigh.

Rules 1.15 and 1.16 of the Oklahoma Rules of Professional Conduct also support our holding. Rule 1.15 requires that an attorney safeguard all clients' property in the attorney's possession and preserve records of account funds and other property for at least 5 years after representation is terminated. Okla. Stat. Ann. tit. 5, Ch. 1, App. 3-A, R 1.15(a). Rule 1.16, Oklahoma Rules of Professional Conduct, requires:

> (d) Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as * * * surrendering papers and property to which the client is entitled * * *. The lawyer may retain papers relating to the client to the extent permitted by other law.

Okla. Stat. Ann. tit. 5, Ch. 1, App. 3-A, R 1.16(d). The Comment to rule 1.16 explains the last clause of the quoted rule above by noting that the attorney may retain papers as a security for a fee only to the extent permitted by law.

The Oklahoma Rules of Professional Conduct cited above illustrate the fiduciary nature of the attorney-client relationship. They emphasize the attorney's duty to keep details of his representation of a client confidential, even after the representation has been terminated, and they suggest that, while an attorney may retain documents related to his representation of the client in certain situations, those documents rightfully belong to the client and should not be disposed of or exposed in a way that may be detrimental to the client. Although McVeigh cannot and his successors likely will not attempt to have the Oklahoma Rules of Professional Conduct enforced against petitioner, the rules do suggest that petitioner is not the exclusive owner of the materials, regardless of his rightful possession of the materials themselves or of additional copies of those materials, and that petitioner was not entitled to dispose of, publicize, or capitalize on them for his personal gain.

Petitioners rely primarily on Corrigan v. Armstrong, Teasdale, Schlafly, Davis & Dicus, 824 S.W.2d at 98, to support their assertion of petitioner's exclusive legal ownership of the materials in issue in this case. However, the court in Corrigan

was faced with the narrow question of ownership of notes, working papers, drafts, and internal memoranda written by the attorney, over which the client in that case asserted an ownership interest superior to that of her attorney. Id. at 96. The materials in issue in this case are distinguishable from those in the Corrigan case because they are not petitioner's work product and do not contain his ideas, opinions, or impressions. See id.

Because the materials are not work product, it is not necessary for us to determine in this case whether Oklahoma would follow the majority or minority view with regard to ownership of case files. We are aware of no court that has held that clients have no ownership interests in their respective case files. Rather, as we have summarized above, all jurisdictions that have considered explicitly the issue of ownership of case files have held that clients have superior property rights in at least those items in the case file that are not the attorney's self-created work product. Those courts that have reserved a property right to the attorney have done so only with regard to the attorney's personal notes, working drafts and papers, and internal memoranda. The materials in issue in this case fall outside of this work product exception. Thus, under either approach, the documents in issue in this case belong properly to petitioner's client, McVeigh, and not to petitioner. Petitioner, in effect, was merely the authorized and incidental custodian of the copies

in issue and had no ownership rights sufficient to effect a gift or support a charitable contribution deduction under section 170. See Pettit v. Commissioner, 61 T.C. at 639.

Although not dispositive, it is also relevant that Oklahoma law recognizes a common law possessory or retaining lien with respect to an attorney's retention of his client's papers, money, or other property that are in the attorney's possession until fees for services rendered are paid by the client. Britton & Gray, P.C. v. Shelton, 69 P.3d 1210, 1212 (Okla. Civ. App. 2003) (citing State ex rel. Okla. Bar Association v. Cummings, 863 P.2d 1164, 1168-1170 (Okla. 1993)). The existence of such a retaining lien supports our conclusion that Oklahoma law generally considers property that is held by an attorney in the scope of representing his client as properly belonging to the client, against whose possessory interest the retaining lien may attach.

Petitioners argue further that, because it is undisputed that attorneys are entitled to retain copies of their clients' case files even after surrendering them to their clients and because the materials are copies, not originals, the copies belong legally to petitioner, and thus he may claim an ownership interest in them. We are not persuaded by petitioners' implicit argument that an attorney's right to maintain a copy of his client's file after termination of representation includes a right to publicize, sell, or otherwise dispose of the case file

to the attorney's benefit.  Moreover, this argument by petitioners undermines their assertions as to the value of the collection of copies and the amount of their charitable contribution deduction.  The appraisal of copied documents from an attorney's case file as if it contained originals or the only set of documents, even if discounted by 50 percent because all the documents were photocopies, and without regard to the existence of multiple sets of the copies, is a major defect in the Payne appraisal.

Finally, even if the materials were the work product of petitioner such that he was potentially the legal owner of them, petitioners would not be entitled to a charitable contribution deduction for the donation of them.  The amount of any charitable contribution of property otherwise taken into account for the deduction under section 170(a) must be reduced by the amount of gain that would not have been long-term capital gain (i.e., by the amount of gain that would have been ordinary gain) if the property contributed had been sold by the taxpayer at its fair market value.  Sec. 170(e)(1)(A).  Thus, unless the materials were long-term capital assets, petitioners' deduction, if otherwise allowable, would be limited to their cost or basis in the materials.  See id.  Section 1221(a)(3) specifically excludes from the definition of "capital asset":

(3) a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property, held by--

(A) a taxpayer whose personal efforts created such property, [or]

(B) in the case of a letter, memorandum, or similar property, a taxpayer for whom such property was prepared or produced * * *

Because the materials would fall under the exclusion of letters, memoranda, or similar property created by the taxpayer's own efforts, if they had been created by the taxpayer's own efforts and were work product, we would be required to treat them as ordinary assets.  Thus, even if petitioners could fall within the minority work product exception to the general rule that a client's case file legally belongs to the client, their allowable deduction would be limited to their basis in the materials. Petitioners have presented no evidence that the basis in the materials was greater than zero.  Thus, even if we held that petitioner legally owned the materials under a work product exception, section 170(e)(1)(A) would limit petitioners' deduction to zero, the amount of petitioners' basis.

Because petitioner was not the legal owner of the materials, he was not legally capable of divesting himself of the burdens and benefits of ownership or effecting a valid gift of the materials.  He is therefore not entitled to any deduction under section 170 for his donation of the materials.  Because the materials contain merely copies of documents and other items that

have been duplicated many times and are in the possession of many different people and entities, we have serious doubts about the value asserted by petitioners' appraiser.  However, because petitioner was not the legal owner of the materials and was not legally entitled to donate them, we need not reach the valuation issue.

We have considered all arguments by the parties, and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered for respondent</u>.